UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISON

CASE NO:. 1:24cv24236

AT LAW AND IN ADMIRALTY

LISA ARMENDA MCDANIEL,

       Plaintiff,

v.

CARNIVAL CORPORATION, d/b/a
CARNIVAL CRUISE LINE, *in personam*

       Defendant.

_____/

**PLAINTIFF LISA ARMENDA MCDANIEL'S  COMPLAINT
AND DEMAND FOR JURY TRIAL**

      Plaintiff, LISA ARMENDA MCDANIEL, hereby sues Defendant, CARNIVAL CORPORATION, d/b/a CARNIVAL CRUISE LINE, *in personam*, and files this complaint for damages, and in support thereof, would respectfully show as follows:

**JURISDICTION, VENUE, AND PARTIES**

      1.     This is an action for damages in excess of $75,000 exclusive of interest, cost, and attorney's fees.

      2.     Plaintiff, LISA ARMENDA MCDANIEL (hereinafter "Plaintiff"), is a *sui juris* natural person, and Texas citizen residing in Wichita Falls, Texas.

      3.     Defendant, CARNIVAL CORPORATION, d/b/a CARNIVAL CRUISE LINE (hereinafter referred to as "CARNIVAL" or "Defendant"), is a Panamanian corporation with its principal place of business in Miami-Dade County, Florida. Defendant CARNIVAL is both a

citizen of Panama and a citizen of The State of Florida for purposes of determining subject matter jurisdiction over this action.

4.      At all material times, Defendant CARNIVAL was operating under the fictitious name "CARNIVAL CRUISE LINES."

5.      At all times material hereto, Defendant CARNIVAL owned, operated, managed, and/or principally controlled the cruise ship, *CARNIVAL DREAM* (Official No. 3491909B; IMO 9378474; Call Sign 3ETA7) on which the subject negligence and incident occurred.

6.      Federal subject matter jurisdiction arises under and by virtue of Diversity of Citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different States and/or citizens of a State and citizens or subjects of a foreign state.  Specifically, Plaintiff is a resident and citizen of Texas, while Defendant is a citizen of Panama and Florida. Alternatively, this action also arises under and by virtue of the admiralty or maritime jurisdiction pursuant to 28 U.S.C. § 1333.

7.      At all material times, Defendant CARNIVAL has conducted ongoing substantial and not isolated business activities in Miami-Dade County, Florida, in the Southern District of Florida (and in the Miami Division), so that *in personam* jurisdiction over Defendant CARNIVAL exists in the United States District Court for the Southern District of Florida.

8.      At all material times, Defendant CARNIVAL was, and is, engaged in the business of operating maritime cruise vessels for paying passengers, including the Plaintiff, and for this purpose operated, among other vessels, the *CARNIVAL DREAM*.

9.      In the operative passenger ticket contract, Defendant CARNIVAL requires fare-paying passengers such as the Plaintiff to bring any lawsuit against it arising out of injuries or

events occurring on the cruise voyage in this federal judicial district, and venue is proper in this Court pursuant to the aforementioned forum/venue selection clause contained in the ticket contract.

10.     Alternatively, venue is also proper, pursuant to 28 U.S.C. §1391, because Defendant CARNIVAL's principal place of business is located within this judicial district.  The Defendant, at all times material hereto, itself or through an agent or representative, in the county and in the District in which this Complaint is filed:

(a)     operated, conducted, engaged in, or carried on a business venture in this state and/or county; and/or;

(b)     had an office or agency in this state and/or country; and/or

(c)     engaged in substantial activity within this state; and/or

(d)     committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193.

11.     Plaintiff has complied with all conditions precedent to bringing this action, including providing Defendant CARNIVAL with timely notice as required by the ticket contract. In addition, Plaintiff's injuries were reported to, documented, and treated by the *CARNIVAL DREAM*'s medical crew immediately after the incident in question occurred. Accordingly, all conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

## LIABILITY AND DAMAGE ALLEGATIONS COMMON TO ALL COUNTS

12.     **DATE OF THE INCIDENT.**  The incident occurred on February 23, 2024 at approximately 9:25 p.m.

13.     **LOCATION OF THE INCIDENT.**  The incident occurred onboard the passenger vessel CARNIVAL DREAM, while the ship was transiting navigable waters (within the Gulf of Mexico) from Cozumel, Mexico to Galveston, Texas. Accordingly, Plaintiff's claims are governed by general maritime law.

14.     **STATUS OF THE PLAINTIFF AT THE TIME OF THE INCIDENT.**  At all times material hereto, Plaintiff was a passenger on the subject cruise ship described herein and, accordingly, was an invitee while onboard the vessel in question.

15.     **DESCRIPTION OF THE INCIDENT AND DANGEROUS CONDITION.** The incident occurred while Plaintiff was walking in a common passenger walkway after leaving the dining room area on what she believes to have been Deck 5. While walking in a normal manner within the passenger corridor, Plaintiff suddenly and unexpectedly tripped and fell over/on a dangerous tripping hazard existing in a designated, accessible pedestrian walkway of the vessel. The hazard in question was created by deficient, insufficient, or deteriorated underlayment/padding beneath the carpet in an area adjoining a raised transition strip which was not properly secured to the subfloor and/or was not inspected/maintained to be flush with the surface. These unsafe and unidentified/warned of conditions created a concealed and unmarked change in elevation that violated industry standards, created an unreasonably dangerous tripping hazard, and for which no warnings were provided.  The transition strip appeared to provide a level transition from the carpet flooring, and disguised a change in elevation by creating the optical illusion and expectation that it was flush/level with the carpet height (as experienced in other areas of the vessel), preventing Plaintiff from being able to foresee or avoid the danger.  Specifically, Plaintiff tripped when her foot caught on the raised transition strip, which was protruding above the level of the adjoining depressed carpet flooring, and which created an unreasonably unsafe tripping hazard, causing her to fall face-forward into a stationary granite end table next to a couch, and a wall window frame. Among other things, Plaintiff struck the left side of her face/cheekbone on the edge of the tabletop, her left shoulder on the base of the end-table, and right shoulder on a wall window frame.

16.     The change in elevation in the area where the carpeting adjoins the transition strip violated national and international codes, standards, guidelines, and/or recommendations applicable to changes in levels of such walkway surfaces. CARNIVAL's failure to follow recognized rules and guidelines is admissible to show how a reasonable person might have acted. *Darville v. Rahming Shipping Ltd.*, No. 85-1282-CIV-MARCUS, 1987 WL 48393, at *10 (S.D. Fla. Dec. 17, 1987).

17.     Even though CARNIVAL knew or should have known that its flooring was uneven and that it utilized transition strips in high-traffic common area passenger walkways on the *CARNIVAL DREAM* which were not flush with the surrounding flooring, CARNIVAL chose to not address those issues or to warn passengers, including Plaintiff, of such dangerous conditions. CARNIVAL failed to post warning signs or provide any other notice to passengers that there was a sudden change of elevation in the subject walkway and gaps presented by the raised and unsecured transition strip.  CARNIVAL failed to provide handrails next to the change of elevation to assist passengers in traversing this sudden uneven walkway area and/or illustrate the change of flooring elevation. Additionally, CARNIVAL's lighting at the location of the incident was inadequate to enable passengers, such as the Plaintiff, to identify the dangerous conditions upon approach.

18.     The incident in question occurred due to the unsafe conditions of the subject passageway as described herein. As a result of the incident in question, Plaintiff sustained, and continues to suffer from, personal and emotional injuries, including but not limited to: multiple fractures of left arm (including ball joint of left shoulder and humorous bone); facial lacerations, and pain, soreness, and numbness from trauma; and orthopedic trauma to her right shoulder, right upper thigh, and upper back.  Further, Plaintiff has experienced, and continues to experience, post-

traumatic stress, anxiety, headaches, and trouble sleeping as a result of the injuries she sustained and the incident in question.

19.     At all times material hereto, Defendant CARNIVAL operated, managed, maintained, and was in exclusive control of the *CARNIVAL DREAM*. The *CARNIVAL DREAM* is a cruise ship which CARNIVAL had custom-built to specifications and designs which were made by and/or under the supervision and participation of CARNIVAL.  The *CARNIVAL DREAM* was designed by or at the direction of the New Build Department of CARNIVAL.  That department employs architects, designers, and engineers. The hull and the interior of the vessel was built in Italy at a shipyard under the constant supervision of CARNIVAL's onsite construction managers, designers, architects, and engineers. Under CARNIVAL's contract with the shipyard, CARNIVAL maintained not only full access to inspect the ship, but also had the ability and authority to reject and change any design or construction feature of the vessel while at the shipyard and for a period of time thereafter. Such features included the raised threshold which caused this fall and Plaintiff's resultant injuries. CARNIVAL selected, approved, and/or participated in the design, selection of floor materials and/or the construction of CARNIVAL's common passenger walkways on its vessel, the *CARNIVAL DREAM*. On the *CARNIVAL DREAM* and throughout its fleet, CARNIVAL chose to and/or approved to install common passenger walkways which are uneven and contain gaps between the transition strip and the flooring beneath.

20.     The *CARNIVAL DREAM* was delivered to CARNIVAL as finished on September 21, 2009. CARNIVAL has operated, maintained, and exercised full control over the vessel continuously since that time. With and because of this control, CARNIVAL had opportunity and authority to make changes to any design or structural aspect of the vessel, including to the interior finishes, lighting, signage, flooring, floor covering, and transition strips thereon.  Such changes

can be made by CARNIVAL while the vessel is in dry dock, in wet dock, at dock during a cruise, and while the vessel is underway. These changes can be made by CARNIVAL utilizing contractors at a shipyard, contractors which come dockside while the vessel is in service, the vessel's permanent crew which includes maintenance, joiners (carpenters), electricians, and others, and/or by riding crews (contractors brought onto the vessel for a specific construction or renovation project).

21.     CARNIVAL is in the hospitality business.  As such, CARNIVAL provides its passengers with private passenger cabins for passengers to stay in throughout the duration of each cruise.  The only way for passengers to access the passenger cabins on the vessel is to transit through CARNIVAL's common area passenger walkways. Accordingly, CARNIVAL knew or should have known that passengers would routinely move through CARNIVAL's common area passenger walkways throughout the duration of each CARNIVAL cruise. Nevertheless, on the date of the subject incident, portions of CARNIVAL's common area passenger walkways aboard the *CARNIVAL DREAM* were uneven and incorporated transition strips which were not flush with the surrounding flooring. These hazardous anomalies were indistinguishable from the surrounding flooring, and imperceptible by passengers, such as Plaintiff, utilizing CARNIVAL's common area passenger walkways.

22.     **CONSTRUCTIVE NOTICE: PRIOR SIMILAR INCIDENTS.**  Additionally, CARNIVAL knew or should have known that passengers tripping on uneven walkways and transition strips not flush with the surrounding flooring is an on-going, repetitive problem because CARNIVAL features these unreasonably dangerous conditions on many, if not most, of the ships in CARNIVAL's fleet. CARNIVAL knew or should have known that passengers are not familiar with these uneven walkways and non-flush transition strips, and that such conditions are not

readily apparent to passengers on board CARNIVAL's cruise ships. CARNIVAL has known for years that passengers trip, fall, and injure themselves as a result of such unsafe conditions known by CARNIVAL, and that such injuries to their passengers is, and was at the time of Plaintiff's injury, foreseeable by CARNIVAL.

23.     CARNIVAL's uneven flooring and raised, unsecured transition strips have been causing trips, falls, and injuries onboard CARNIVAL's vessels for years. Upon information and belief, CARNIVAL documents slip and/or trip and falls, stumbling and/or loss of balance on its uneven flooring and/or raised, unsecured transition strips occurring on its vessels.  Upon further information and belief, that documentation includes: minutes of shipboard meetings; logs or databases of prior similar incidents of slip and/or trips and falls, stumbling and/or loss of balance; databases of prior complaints made to guest services; and prior inspection and/or testing of common passenger walkways. Some, but by no means all, prior similar incidents and/or complaints include the following incidents involving former CARNIVAL passengers:

- ***Reed v. Carnival Corp.***; Case No. 1:24-cv-21330 – Cheryl Reed Johnson tripped on a raised metal transition-strip threshold onboard the *CARNIVAL CONQUEST* on May 21, 2023.  CARNIVAL was also the owner and/or operator of the *CARNIVAL CONQUEST*.

- ***Iverson-Kristen v. Carnival Corp.***; Case No. 1:23-cv-22523 – Shirley Iverson-Kristen tripped on a raised metal transition-strip threshold onboard the *CARNIVAL SPIRIT* on July 6, 2022.  CARNIVAL was also the owner and/or operator of the *CARNIVAL SPIRIT*.

- ***Brack v Carnival Corp.***; Case No. 1:23-cv-22161 – Donna Brack tripped on a raised metal transition-strip threshold onboard the *CARNIVAL FREEDOM* on November 21, 2022. CARNIVAL was also the owner and/or operator of the *CARNIVAL FREEDOM*.

- ***Palese v. Carnival Corp.***; Case No. 1:23-cv-21487 – Beth Palese tripped on a raised metal transition-strip threshold on Deck 9 of the *CARNIVAL LEGEND* on June 21, 2022. CARNIVAL was also the owner and/or operator of the *CARNIVAL LEGEND*.

- ***Patton v. Carnival Corp.***; Case No. 1:22-cv-21158 – Marilyn Patton tripped over a raised metal transition-strip threshold which was improperly affixed and not adequately secured to the floor on Deck 9 of the *CARNIVAL VICTORY* on October 15, 2019.  CARNIVAL was also the owner and/or operator of the *CARNIVAL VICTORY*.

- ***Smith v. Carnival Corp.***; Case No. 1:21-cv-20098 – Carol Smith tripped and fell on the threshold on the Lido Deck on board the *CARNIVAL PARADISE* on February 15, 2020. CARNIVAL was also the owner and/or operator of the *CARNIVAL PARADISE*.

- ***Dupuis v. Carnival Corp.***; Case No. 1:20-cv-23378 – Bonita Dupuis tripped and fell on the threshold on the Lido Deck on board the *CARNIVAL FREEDOM* on September 10, 2019.  CARNIVAL was also the owner and/or operator of the *CARNIVAL FREEDOM*.

- ***Hoddor v. Carnival Corp.***; Case No. 1:20-cv-21065 – Alice Hoddor tripped and fell on an uneven and/or sloped common passenger hallway leading to her passenger cabin on *CARNIVAL VICTORY* on April 1, 2019.  CARNIVAL was also the owner and/or operator of the *CARNIVAL VICTORY*.

- ***Hicks v. Carnival Corp.***; Case No. 1:19-cv-20686 – Frances Hicks tripped over a raised metal transition-strip threshold on April 7, 2018 while onboard the *CARNIVAL FREEDOM*. Hicks defeated summary judgment by showing 18 prior trip and falls over thresholds similar to the one present in the case.  CARNIVAL was also the owner and/or operator of the *CARNIVAL FREEDOM*.

- ***Nepost v. Carnival Corp.***; Case No. 1:18-cv-24966 – Claudine Nepost tripped and fell on the threshold of the Lido Deck on board the *CARNIVAL TRIUMPH* on October 19, 2017. CARNIVAL was also the owner and/or operator of the *CARNIVAL TRIUMPH*.

- ***Bunch v. Carnival Corp.***; Case No. 1:18-cv-21867 – Paulette Howard-Bunch tripped over a raised metal transition-strip threshold on Deck 11 onboard the *CARNIVAL GLORY* on July 24, 2017.  CARNIVAL was also the owner and/or operator of the *CARNIVAL GLORY*.

- ***Hutchinson v. Carnival Corp.***; Case No. 1:18-cv-22117 – Debora Hutchinson tripped over a raised metal transition-strip threshold on the Lido Deck on board the *CARNIVAL FREEDOM* on July 22, 2017.  CARNIVAL was also the owner and/or operator of the *CARNIVAL FREEDOM*.

Based upon this knowledge, and additional knowledge which will be revealed through discovery, CARNIVAL knew or should have known with the exercise of reasonable care, that CARNIVAL's uneven flooring and raised, unsecured transition strips presented a hazardous condition to passengers such as Plaintiff.

24.  **NOTICE: POLICY AND PROCEDURES.**  Additionally, CARNIVAL knew or should have known that uneven flooring and transition strips which were not flush with the surrounding flooring were and are dangerous to passengers, including Plaintiff, because CARNIVAL's written policy and procedures require CARNIVAL to implement defined measures at such locations onboard its vessels to prevent incidents such as the incident underlying this lawsuit from occurring.

25.  **NOTICE: VIOLATION OF INDUSTRY STANDARDS.**  Additionally, CARNIVAL knew or should have known that relevant industry standards, regulations, and codes dictate the safety standards for walkways.  The uneven walkway and transition strip not flush with

the flooring failed to comply with the following industry standards: ASTM F-1166 subsection 10.1.6 *Even Walking Surfaces* and subsection 11.3.4 *Landings*; ASTM F-1637 Subsection 5.1 *Standard Practice for Safe Walking Surfaces* (5.1.1 and 5.1.2) and subsection 5.2; *Walkway Changes in Level* (5.2.1 – 5.2.4); SOLAS Chapter II-2, Part D, Regulation 13-*Means of Escape* Subsection 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.") and subsection 7.1.5 ("escape routes shall not be obstructed by furniture or other obstructions"); and IACS Recommendation No. 132-2013 *Human Element Recommendations* Subsection 4.6.4 ("Ergonomic Structure Arrangement for walkways').

26.    "[T]he law in the Eleventh Circuit, as established by the former Fifth Circuit, is that advisory guidelines and recommendations, while not conclusive, are admissible as bearing on the standard of care in determining negligence." *Cook v. Royal Caribbean Cruises, Ltd*., No. 11–20723–CIV, 2012 WL 1792628, at *3 (S.D. Fla. May 15, 2012) (citing *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir.1975); *Frazier v. Continental Oil Co.*, 568 F.2d 378 (5th Cir.1978)). Such guidelines are also probative of the defendant's constructive knowledge of the hazardous condition. *See Cook*, 2012 WL 1792628, at *3; *Donlon v. Gluck Grp., LLC*, No. 09–5379 (JEI/KMW), 2011 WL 6020574, at *6 (D.N.J. Dec. 2, 2011); *see Holderbaum v. Carnival Corp.,* 87 F. Supp. 3d 1345 (S.D. Fla. February 19, 2015) (the court held that based on the IMO recommendation and the record evidence, a reasonable jury could conclude that the handrail was too large, hazardous, and that Defendant knew it was too large and hazardous); *Muncie Aviation Corp.,* 519 F.2d at 1181 (holding that to the extent the defendant's pilot failed to consult advisory materials issued by the Federal Aviation Administration, or failed to follow their recommendations, "the jury could permissibly infer that he failed to meet the appropriate standard of due care"); *Frazier*, 568 F.2d at 381–82 (holding that the district court erroneously excluded testimony

11

concerning violations of industry standards to Case 1:21-cv-20098-CMA Document 1 Entered on FLSD Docket 01/08/2021 establish the defendant's negligence); *see also Donlon*, 2011 WL 6020574, at *6 (denying summary judgment motion filed by houseboat manufacturer in lawsuit filed by person who fell down the stairs of a houseboat, holding that non-binding standards promulgated by the American Society for Testing and Materials were admissible because a jury could use the evidence to conclude that the stairs "were defectively designed" and because the standards put defendant "on constructive notice of the potential danger of the stairs").

**COUNT I**
**<u>NEGLIGENT FAILURE TO MAINTAIN</u>**

27.     Plaintiff adopts and incorporates paragraphs 1-26 above, as though fully set forth verbatim herein.

28.     This is an action for negligence against CARNIVAL for failing to maintain the vessel, including the flooring and the improperly secured transition strip on the *CARNIVAL DREAM*, and located at the location and time of Plaintiff's injury as described above.

29.     **<u>DUTIES OWED BY CARNIVAL</u>**. CARNIVAL owes a "duty to exercise reasonable care for the safety of its passengers," including Plaintiff. *See Hall v. Royal Caribbean Cruises, Limited*, 2004 WL 1621209 (Fla. 3d DCA 2004).  CARNIVAL also owes a "duty to exercise reasonable care under the circumstances."  *See Harnesk v. Carnival Cruise Line, Inc*., 1991 WL 329584 (S.D. Fla. 1991).

30.     CARNIVAL owes a duty as a common carrier to its passengers to maintain the ship including the transition strips and walkways on board the *CARNIVAL DREAM* in a safe condition. CARNIVAL owes a duty of reasonable care under the circumstances. The circumstances are that CARNIVAL owns, operates, and/or manages more than twenty-seven (27) cruise ships, including the *CARNIVAL DREAM*. CARNIVAL is in the hospitality business hosting millions of guests each

12

year onboard its cruise ships. The operations involve attracting crowds to a central location and controlling and ensuring the safety of those crowds. CARNIVAL provides its passengers with private passenger cabins to stay in throughout the duration of each cruise. The only way for passengers to get to and/or access such passenger cabins is to walk through CARNIVAL's common area passenger walkways. CARNIVAL knows that passengers will move throughout CARNIVAL's common area passenger walkways on a repetitive basis throughout the duration of each CARNIVAL cruise. Therefore, CARNIVAL knew or should have known to make sure there were no tripping and/or fall hazards in the line of passenger travel, including the lifted transition strip where Plaintiff tripped on February 23, 2024.

31.     CARNIVAL, at all times relevant hereto, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including Part D, Regulation 13, subpart 1.1 "safe escape routes shall be provided."); subpart 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.").  CARNIVAL's walkways are escape routes which CANRIVAL knew or should have known it is required to maintain in a safe condition.

32.     CARNIVAL had actual notice of the dangerous condition; and/or had constructive notice of the dangerous condition.

33.     CARNIVAL knew or should have known of the dangerous unsafe condition on board the *CARNIVAL DREAM* during the subject cruise. CARNIVAL knew that the defective and/or otherwise unsafe transition strip was present, and CARNIVAL in fact participated in its design and/or construction.

34.     CARNIVAL also knew or should have known of the dangerous conditions on board *CARNIVAL DREAM* including the uneven walkways and transition strips which were not flush with the surrounding flooring based upon the occurrence of many prior similar incidents or complaints on CARNIVAL's vessels throughout its fleet.

35.     CARNIVAL documents trip and falls in several ways which may include prior shipboard safety meetings; work orders; prior repairs; logs or databases of prior similar incidents of trip and falls; prior complaints made to guest services throughout its fleet; safety testing and/or inspections

testing.

36.     CARNIVAL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe walkways. Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of stair and walkway safety standards and guidelines which apply to the marine environment. *See, e.g.*, IMO, MSC Circular 735 (24 June 1996); U.S. Access Board, Draft Passenger Vessel Accessibility Guidelines (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

37.     CARNIVAL had constructive knowledge of the dangerous condition by, *inter alia*, (a) the length of time the dangerous condition existed; (b) the nature of the dangerous condition and/or (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some

regularity. Thus, the dangerous condition was reasonably foreseeable, and in the exercise of reasonable care CARNIVAL should have known about it.

38.     The unmarked, raised transition strip constitutes an unsafe or foreseeably hazardous condition onboard the *CARNIVAL DREAM*. Where a cruise line defendant creates an unsafe or foreseeably hazardous condition, a plaintiff need not prove that the defendant had actual or foreseeable notice of the condition in order to show negligence. Defendant CARNIVAL created the condition or, alternatively, had actual or constructive notice of the condition by, *inter alia*, the length of time the condition existed; the size or nature of the condition; or the fact that the condition, a similar condition, or the cause of the condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity. For the aforementioned reasons, the condition was reasonably foreseeable and in the exercise of reasonable care, CARNIVAL should have known about it. Further, CARNIVAL had notice of the condition for a sufficient time to remedy the hazardous condition.

39.     **CARNIVAL BREACH ITS DUTY**. CARNIVAL breached its duty to maintain the ship including the underlayment padding and transition strip in the common passenger walkway on board the *CARNIVAL DREAM* in a safe condition. CARNIVAL breached its duties to Plaintiff by its actions and conduct. CARNIVAL also failed to comply with applicable industry standards, statutes, and /or regulations which invokes the Pennsylvania Rule and shifts the burden of proof to the Defendant in the proof of negligence or proof of the absence of negligence. CARNIVAL's violation of applicable and mandatory safety regulations and standards constitutes negligence *per se*.

40.     **PROXIMATE CAUSE**. CARNIVAL's failure to maintain the ship including the underlayment padding and transition strip in the common passenger walkway on board the

*CARNIVAL DREAM* in a safe condition, proximately caused MCDANIEL's injuries. Had CARNIVAL properly maintained the ship including the underlayment padding and transition strip in the common passenger walkway on board the *CARNIVAL DREAM* in a safe condition, MCDANIEL would have never have tripped and fell on the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM* on February 23, 2024.

41.     **DAMAGES**. As a direct and proximate result of the negligence of CARNIVAL, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and/or treatment, transportation costs, loss of earnings, loss of the ability to earn money, and/or an aggravation of a previously existing condition.  All or part of the Plaintiff's losses are permanent and/or continuing in nature and Plaintiff shall continue to suffer from those losses in the future.

42.     WHEREFORE, Plaintiff, MCDANIEL, demands Judgement against CARNIVAL for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the past; and lost income and income earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest form the date of the subject incident under the General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT II**
**NEGLIGENT FAILURE TO WARN**

43.      Plaintiff adopts and incorporates paragraphs 1-26 above, as though fully set forth

verbatim herein.

44.      This is an action for negligence of CARNIVAL's failure to warn passengers,

including Plaintiff, of its hazards, risk or dangers.

45.      **DUTIES OWED BY THE DEFENDANT**. CARNIVAL owes a "duty to exercise

reasonable care for the safety of its passengers," including MCDANIEL. *See Hall v. Royal*

*Caribbean Cruises*, *Ltd.*, 2004 WL 1621209 (Fla. 3d DCA 2004). The Defendant also owes a "duty

to exercise reasonable care under the circumstances." *See Harnesk v. Carnival Cruise Lines, Inc.*,

1991 WL 329584 (S.D. Fla. 1991). Additionally, the Defendant's "duty is to warn of dangers

known to the carrier in places where the passenger is invited to or may reasonably be expected to

visit." *See Vierling v. Celebrity Cruises*, *Inc*., 339 F.3d 1309 (11th Cir. 2003) ("Courts sitting in

admiralty have long recognized an obligation on the part of a carrier to furnish its passengers with

a reasonably safe means of boarding and leaving the vessel, that this obligation is non-delegable,

and that even the slightest negligence renders a carrier liable."); *Carlisle v. Ulysses Line Limited*,

475 So.2d 248 (Fla. 3d DCA 1985).

46.      CARNIVAL owes a duty as a common carrier to its passengers to maintain the ship

including the underlayment padding and transition strip in the common passenger walkway on

board the *CARNIVAL DREAM* in a safe condition. CARNIVAL owes a duty of reasonable care

under the circumstances. The circumstances are that CARNIVAL owns and/or manages more than

twenty-seven (27) cruise ships, including the *CARNIVAL DREAM*. CARNIVAL is in the

hospitality business of operating bars, buffets-style restaurants, and dining halls onboard its cruise

ships. These operations involve attracting crowds to a central location and controlling and ensuring

the safety of those crowds. One of CARNIVAL's busiest central locations is its dining halls and the walkways leading to them. CARNIVAL requires passengers to enter through specific deck to enter one of the dining halls. CARNIVAL's dining halls are busy highly trafficked areas. For these reasons, CARNIVAL's duty of care includes warning of dangerous conditions present in and around the ship including the walkway where MCDANIEL tripped and fell on February 23, 2024.

47.    CARNIVAL, at all relevant times, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including *Part D*, *Regulation 13*, subpart 1.1 "safe escape routes shall be provided."); subpart 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.") CARNIVAL's walkways and doorways are escape routes that CARNIVAL knew or should have known it must maintain in a safe condition.

48.     The Defendant had actual notice of the dangerous condition; and/or had constructive notice of the dangerous condition.

49.    CARNIVAL also knew or should have known of the dangerous condition of the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM* because of prior similar incidents or complaints. CARNIVAL documents incidents in several ways which may include prior shipboard safety meetings; work orders; prior repairs; logs or databases of prior similar incidents; prior complaints made to guest services throughout its fleet; safety testing and/or inspections testing.

50.    CARNIVAL knows or should know that the underlayment padding and transition strip were dangerous because CARNIVAL's written policy and procedures require CARNIVAL

to implement proper measures to prevent incidents on board its ships by providing "watch your step" warnings on dangerous walking surfaces that are not readily apparent to passengers.

51.     CARNIVAL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe walkways. Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of stair and walkway safety standards and guidelines which apply to the marine environment. *See*, *e.g.*, IMO, MSC Circular 735 (24 June 1996); U.S. Access Board, Draft Passenger Vessel Accessibility Guidelines (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

52.     The Defendant had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the nature of the dangerous condition and/or (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care the Defendant should have known about it

53.     CARNIVAL is aware that it owes a duty as a common carrier to its passengers to warn of dangers known to CARNIVAL where CARNIVAL invite or reasonably expect passengers to go. CARNIVAL distributes crew member training materials; safety warning messages including those made through verbal announcement, newsletters, and safety videos. CARNIVAL train its crew members to warn passengers of hazardous or dangerous conditions verbally, with warning signs, and/or marking the area or blocking off the area to prevent passengers from walking on the

hazardous and/or dangerous condition. Despite this, CARNIVAL failed to warn MCDANIEL of the dangerous conditions on board the *CARNIVAL DREAM* including the underlayment padding and transition strip.

54.    **CARNIVAL BREACHED ITS DUTY**. CARNIVAL breached its duty to warn MCDANIEL of the dangerous conditions on board the *CARNIVAL DREAM* including the underlayment padding and transition strip. CARNIVAL breached its duties to MCDANIEL by its actions and conduct. CARNIVAL through its crew members failed to reasonably and regularly place signs, stickers, lights, and other visual or written notices on or near the dangerous conditions of the underlayment padding and transition strip in the common passenger walkway on board the *CARNIVAL DREAM*. CARNIVAL's crew members failed to reasonably and regularly make audible announcements of the dangerous condition of the underlayment padding and transition strip in the common passenger walkway on board the *CARNIVAL DREAM*. CARNIVAL also failed to comply with comply with applicable industry standards, statutes, and/or regulations which invokes the Pennsylvania Rule and shifts the burden of proof to the Defendant in the proof of negligence or proof of the absence of negligence. CARNIVAL's violation of applicable and mandatory safety regulations and standards constitutes negligence *per se*.

55.    **PROXIMATE CAUSE**. CARNIVAL's failure to properly warn MCDANIEL of the dangerous conditions on the ship including the underlayment padding and transition strip on board the *CARNIVAL DREAM* proximately caused MCDANIEL's injuries. Had CARNIVAL properly warned MCDANIEL of the tripping hazards, MCDANIEL would have been aware of the dangerous condition of the underlayment padding and transition strip in the common passenger walkway on board the *CARNIVAL DREAM*. MCDANIEL therefore would have never tripped and fell on the underlayment padding and transition strip in the common passenger walkway.

56.    **DAMAGES**. CARNIVAL's negligence proximately caused permanent injuries and damages to MCDANIEL in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. MCDANIEL has suffered these losses in the past and will continue to suffer them in the future.

57.    WHEREFORE, Plaintiff, MCDANIEL, demands Judgment against CARNIVAL for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the past; and lost income and income earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under the General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT III**
**NEGLIGENT DESIGN, CONSTRUCTION AND SELECTION OF MATERIALS**

58.    The Plaintiff, MCDANIEL, hereby adopts and re-alleges each and every allegation in Paragraphs 1-26 above.

59.     This is an action for negligence due to CARNIVAL's negligent design, construction and selection of materials.

60.     **DUTIES OWED BY CARNIVAL**. CARNIVAL owes a "duty to exercise reasonable care for the safety of its passengers" including MCDANIEL. *See Hall v. Royal Caribbean Cruises, Ltd.,* 2004 A.M.C. 1913, 2004 WL 1621209, 29 FLWD 1672, Case No. 3d03-2132 (Fla. 3d DCA Opinion filed July 21, 2004). The Defendant also owes a "duty to exercise reasonable care under the circumstances." *See Harnesk v. Carnival Cruise Lines, Inc*, 1992 A.M.C. 1472, 1991 WL 329584 (S.D. Fla. 1991). The cruise line is directly negligent for negligent design, construction and selection of materials on the *CARNIVAL DREAM*.

61.     CARNIVAL owes a duty of reasonable care under the circumstances. The circumstances are as follows: The exterior and the interior of the ship was built in Italy at a shipyard under the constant supervision of CARNIVAL's onsite construction managers, designers, architects, and engineers. Under the contract with the shipyard, CARNIVAL has not only full access to the ship to inspect and the ability to inspect the designs used for construction, but also has the ability to reject and change any design or construction at the shipyard and for a period of time thereafter. CARNIVAL holds the ultimate control under their contract with the yard, if an item or design is rejected or at issue and not resolved, CARNIVAL can withhold payment. Under the contract with the shipyard, CARNIVAL not only had full access to the ship to inspect and the ability to inspect the designs used for construction, but also has the ability to reject and change any design or construction at the shipyard and for a period of time thereafter. CARNIVAL hold the ultimate control under their contract with the yard, if an item or design is rejected or at issue and not resolved, CARNIVAL can withhold payment. That includes the materials used on the

underlayment padding and transition strip in the common passenger walkway on board the *CARNIVAL DREAM*.

62.     The *CARNIVAL DREAM* was delivered to CARNIVAL as finished on September 21, 2009. CARNIVAL has operated and maintained the ship continuously since that time. The *CARNIVAL DREAM* is a part of the Dream Class which includes the *CARNIVAL DREAM, CARNIVAL MAGIC,* and *CARNIVAL BREEZE*. CARNIVAL has operated and maintained the other ships in Dream Class, listed above, continuously since the time when each of those ships were first built and put into service. And CARNIVAL also custom built to specifications and designs which were made by or under the supervision and participation of CARNIVAL in all of the Dream Class ships, listed above. The design and construction of these ships was under the supervision and with the participation of Carnival personnel who were stationed onsite in the shipyard during construction.

63.     CARNIVAL maintain shoreside departments that are responsible for the design, selection and construction of CARNIVAL' ships. CARNIVAL also maintain shoreside departments that are responsible for changes and modification to the design, construction and selection of materials when CARNIVAL refit or modify its ships. These shoreside departments consist of naval architects, engineers, designers and other employees who are employed by CARNIVAL. As such, CARNIVAL maintained the ultimate control over the design and construction of the *CARNIVAL DREAM* as well as for all ships in the Dream Class which includes the *CARNIVAL MAGIC* and *CARNIVAL BREEZE*

64.     CARNIVAL chose to create, design, and construct all of the surfaces on board the Carnival Elation including the underlayment padding and transition strip in the common passenger walkway.

65.     CARNIVAL should have known that the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM* was unreasonably dangerous.

66.     CARNIVAL, at all relevant times, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including Part D, Regulation 13, subpart 1.1 "safe escape routes shall be provided."); subpart 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.") CARNIVAL's walkways and doorways are escape routes that CARNIVAL knew or should have known it must maintain in a safe condition.

67.     The Defendant had actual notice of the dangerous condition; and/or had constructive notice of the dangerous condition.

68.     CARNIVAL also knew or should have known of the dangerous condition of the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM* because of prior similar incidents or complaints. CARNIVAL documents incidents in various ways which may include prior shipboard safety meetings; work orders; prior repairs; logs or databases of prior similar incidents; prior complaints made to guest services throughout its fleet; safety testing and/or inspections testing.

69.     CARNIVAL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe walkways, staircases, and floor materials. Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of star and walkway safety standards and guidelines which apply to the marine environment. See, e.g., IMO, MSC Circular 735 (24 June 1996); U.S.

Access Board, Draft Passenger Vessel Accessibility Guidelines (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

70. The Defendant had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the nature of the dangerous condition and/or (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care the Defendant should have known about it.

71. CARNIVAL's duty to design, construct and select materials for all areas and features of its vessels, including the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM*, is part of CARNIVAL's duty of reasonable care under the circumstances. CARNIVAL had a duty to design and construct walkways on board *CARNIVAL DREAM* in a reasonably safe manner and in accordance with industry standards. CARNIVAL's duty is part of its duty of reasonable care under the circumstances.

72. **CARNIVAL BREACHED ITS DUTY**. CARNIVAL breached its duty of care owed to MCDANIEL and was negligent by failing to design, construct, select, approve and/or reject the underlayment padding and transition strip in the common passenger walkway. CARNIVAL failed to design, construct, select, approve and/or reject materials that complied with industry standards. The design and/or materials CARNIVAL selected and used to construct the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM* were unreasonably dangerous.

73.     CARNIVAL chose to place the underlayment padding and transition strip in the common passenger walkway that was indistinguishable from the surrounding floor and not readily apparent to passengers onboard the ship.

74.     Because CARNIVAL had the ultimate control over the design, construction and selection of materials for its ships, CARNIVAL could refuse to approve the design, construction and selection of materials used for the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM*. CARNIVAL knew or should have known about the dangerousness of the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM*.

75.     CARNIVAL knew or should have known of the dangerousness of the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM* since their installation in 2009 and/or any changes or modifications. CARNIVAL's violation of applicable and mandatory safety regulations and standards constitutes negligence *per se*.

76.     **PROXIMATE CAUSE**. CARNIVAL's negligent design, construct and select materials proximately caused MCDANIEL's injuries. Had CARNIVAL properly designed, constructed and selected the materials of the underlayment padding and transition strip in the common passenger walkway on the *CARNIVAL DREAM*, the underlayment padding and transition strip would have been readily apparent to MCDANIEL. MCDANIEL therefore would never have tripped and fell on February 23, 2024.

77.     **DAMAGES**. CARNIVAL's negligence proximately caused permanent injuries and damages to MCDANIEL in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future.

Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. MCDANIEL has suffered these losses in the past and will continue to suffer them in the future.

78.     WHEREFORE, Plaintiff, MCDANIEL, demands Judgment against CARNIVAL for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the past; and lost income and income earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under the General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT IV
## NEGLIGENT TRAINING OF PERSONNEL

79.     The Plaintiff, MCDANIEL, hereby adopts and re-alleges each and every allegation in Paragraphs 1-26 above.

80.      This is an action for negligence of CARNIVAL negligent training of shipboard crewmembers.

81.     **DUTIES OWED BY CARNIVAL**. CARNIVAL owes a "duty to exercise reasonable care for the safety of its passengers," including MCDANIEL. *See Hall v. Royal Caribbean Cruises, Ltd.*, 2004 WL 1621209 (Fla. 3d DCA 2004). The Defendant also owes a "duty

to exercise reasonable care under the circumstances." *See Harnesk v. Carnival Cruise Lines, Inc.*, 1991 WL 329584 (S.D. Fla. 1991). The cruise line is directly negligent for failing to train its shipboard crew members.

82.     CARNIVAL owes a duty as a common carrier to its passengers to train its crew members warn of dangers known to CARNIVAL where CARNIVAL invite or reasonably expect passengers to go. CARNIVAL owes a duty of reasonable care under the circumstances. Those circumstances are that CARNIVAL owns and/or manages more than twenty-seven (27) cruise ships, including the *CARNIVAL DREAM*. CARNIVAL is in the hospitality business of operating bars, buffets-style restaurants, and dining halls onboard its cruise ships. These operations involve attracting crowds to a central location and controlling and ensuring the safety of those crowds. One of CARNIVAL's busiest central locations is its dining halls and the walkways leading to them. CARNIVAL's dining halls are busy highly trafficked areas. For these reasons, CARNIVAL's duty of care includes warning of dangerous conditions present in and around the ship including the common walkway where MCDANIEL tripped and fell on February 23, 2024.

83.     CARNIVAL, at all relevant times, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including Part D, Regulation 13, subpart 1.1 "safe escape routes shall be provided."); subpart 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.") CARNIVAL's walkways and doorways are escape routes that CARNIVAL knew or should have known must maintain in a safe condition.

84.     CARNIVAL train its shipboard crewmembers to warn passengers of the dangerous conditions board the *CARNIVAL DREAM* conditions including the underlayment padding and

transition strip in the common passenger walkway, which may cause passengers to trip and fall. CARNIVAL knew or should have known of the importance of training its crewmembers to warn passengers of the dangerous conditions on board *Carnival Dream* including the underlayment padding and transition strip in the common passenger walkway, which may cause passengers to trip and fall. CARNIVAL train its crewmembers that passenger may not know that surfaces on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway, may be a dangerous and could cause them to trip and fall. CARNIVAL knew or should have known the importance of training its crewmembers that passenger may not know of the dangerous conditions of surfaces on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway. CARNIVAL train its crewmembers to warn passengers of tripping hazards verbally, with warning signs, and/or marking the area or blocking off the area to prevent passengers from tripping and falling. CARNIVAL knew or should have known of the importance of training its crew members to warn passengers of tripping hazards verbally, with warning signs, and/or marking the area or blocking off the area to prevent passengers from tripping and falling. CARNIVAL also distributes crew member training materials; safety warning messages including those made through verbal announcement, newsletters and safety videos. CARNIVAL documents dangerous hazards and prior incidents in various ways which may include prior shipboard safety meetings; work orders; prior repairs; logs or databases of prior similar incidents; prior complaints made to guest services throughout its fleet; safety testing and/or inspections testing. However, despite knowing how and the reason why CARNIVAL should train its crewmembers, CARNIVAL failed to do so.

85.     The Defendant had actual notice of the dangerous condition; and/or had constructive notice of the dangerous condition.

86.     CARNIVAL also knew or should have known of the dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway because of prior similar incidents or complaints on the *CARNIVAL DREAM* and other ships in CARNIVAL's fleet. CARNIVAL documents trip and falls in various ways which may include prior shipboard safety meetings; work orders; prior repairs; logs or databases of prior similar incidents of trip and falls; prior complaints made to guest services throughout its fleet; safety testing and/or inspections testing.

87.     CARNIVAL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe conditions. Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of stair and walkway safety standards and guidelines which apply to the marine environment. See, e.g., IMO, MSC Circular 735 (24 June 1996); U.S. Access Board, Draft Passenger Vessel Accessibility Guidelines (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

88.     The Defendant had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the nature of the dangerous condition and/or (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care the Defendant should have known about it.

89.     CARNIVAL's duty to properly train its crewmembers is part of CARNIVAL's duty of reasonable care under the circumstances. This duty requires CARNIVAL to properly train its crew members to properly to warn passengers of dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway, which may cause passengers to trip and fall.

90.     CARNIVAL should have become aware that it had failed to properly train its crew members given that the crew member(s) were failing to properly warn passengers of the dangerous conditions on board *Carnival Dream* including the underlayment padding and transition strip in the common passenger walkway.

91.     **CARNIVAL BREACHED ITS DUTY:** CARNIVAL breached its duty of care owed to MCDANIEL and was negligent by failing to reasonably train its crewmembers to warn passengers of dangerous conditions on board *Carnival Dream* including the underlayment padding and transition strip in the common passenger walkway, which may cause passengers to trip and fall. CARNIVAL's violation of applicable and mandatory safety regulations and standards constitutes negligence per se.

92.     **PROXIMATE CAUSE:** CARNIVAL's failure to properly train CARNIVAL crew members proximately caused MCDANIEL's injuries. Had CARNIVAL properly trained CARNIVAL's crew members to warn passengers of dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway, which may cause passengers to trip and fall, the crewmember would have warned MCDANIEL of the dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway. MCDANIEL would

have been aware of the dangerous conditions. MCDANIEL therefore would never have tripped and fallen on the underlayment padding and transition strip in the common passenger walkway.

93.     **DAMAGES**: CARNIVAL's negligence proximately caused permanent injuries and damages to MCDANIEL in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. MCDANIEL has suffered these losses in the past and will continue to suffer them in the future.

94.     WHEREFORE, Plaintiff, MCDANIEL, demands Judgment against CARNIVAL for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the past; and lost income and income earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under the General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT V
## NEGLIGENT SUPERVISION OF PERSONNEL

95.     The Plaintiff, MCDANIEL, hereby adopts and re-alleges each and every allegation in Paragraphs 1-26 above.

96.     This is an action for negligence of CARNIVAL negligent supervision of shipboard crewmembers.

97.     **DUTIES OWED BY CARNIVAL**. owes a "duty to exercise reasonable care for the safety of its passengers," including MCDANIEL. *See Hall v. Royal Caribbean Cruises, Ltd.*, 2004 WL 1621209 (Fla. 3d DCA 2004). The Defendant also owes a "duty to exercise reasonable care under the circumstances." *See Harnesk v. Carnival Cruise Lines, Inc.*, 1991 WL 329584 (S.D. Fla. 1991). The cruise line is directly negligent for failing to supervise its shipboard crew members.

98.     CARNIVAL owes a duty as a common carrier to its passengers to train its crew members warn of dangers known to CARNIVAL where CARNIVAL invite or reasonably expect passengers to go. CARNIVAL owes a duty of reasonable care under the circumstances. Those circumstances are that CARNIVAL owns and/or manages more than twenty-seven (27) cruise ships, including the *Carnival Dream*. CARNIVAL is in the hospitality business of operating bars, buffets-style restaurants, and dining halls onboard its cruise ships. These operations involve attracting crowds to a central location and controlling and ensuring the safety of those crowds. One of CARNIVAL's busiest central locations is its dining halls and the walkways leading to them. CARNIVAL's dining halls are busy highly trafficked areas. For these reasons, CARNIVAL's duty of care includes warning of dangerous conditions present in and around the ship including the common walkway where MCDANIEL tripped and fell on February 23, 2024.

99.     CARNIVAL, at all relevant times, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International

Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including Part D, Regulation 13, subpart 1.1 "safe escape routes shall be provided."); subpart 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.") CARNIVAL's walkways and doorways are escape routes that CARNIVAL knew or should have known it must maintain in a safe condition.

100.     The Defendant had actual notice and/or constructive notice of the dangerous condition.

101.     CARNIVAL also knew or should have known of the dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway because of prior similar incidents or complaints on the *CARNIVAL DREAM* and other ships in CARNIVAL's fleet. CARNIVAL documents trip and falls in various ways which may include prior shipboard safety meetings; work orders; prior repairs; logs or databases of prior similar incidents of trip and falls; prior complaints made to guest services throughout its fleet; safety testing and/or inspections testing.

102.     CARNIVAL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe conditions. Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of stair and walkway safety standards and guidelines which apply to the marine environment. See, e.g., IMO, MSC Circular 735 (24 June 1996); U.S. Access Board, Draft Passenger Vessel Accessibility Guidelines (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

103.   The Defendant had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the nature of the dangerous condition and/or (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care the Defendant should have known about it.

104.   CARNIVAL should have become aware of its failure to reasonably supervise its crewmembers to ensure that the crew members are warning passengers of the dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway.

105.   Had CARNIVAL properly supervised its crew members it would have become aware that CARNIVAL had failed to properly train its crew members to warn passengers of the dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway.

106.   CARNIVAL's duty to properly supervise its crewmembers is part of CARNIVAL's duty of reasonable care under the circumstances. This duty requires CARNIVAL to properly supervise its crew members ensure that the crew members are properly warning passengers of the dangerous conditions on board *CARNIVAL DREAM* including the underlayment padding and transition strip in the common passenger walkway, which may cause passengers to trip and fall.

107.   **<u>CARNIVAL BREACHED ITS DUTY</u>**. CARNIVAL breached its duty of care owed to MCDANIEL and was negligent by failing to reasonably supervise its crewmembers to ensure that the crew members are warning passengers of the dangerous conditions on board *Carnival Dream* including the underlayment padding and transition strip in the common passenger

walkway, which may cause passengers to trip and fall. CARNIVAL's violation of applicable and mandatory safety regulations and standards constitutes negligence *per se*.

108.     **PROXIMATE CAUSE**. CARNIVAL's failure to properly supervise CARNIVAL crew members proximately caused MCDANIEL's injuries. Had CARNIVAL properly supervised CARNIVAL's crew members to warn passengers of the dangerous conditions on board *CARNIVAL DREAM* including the the underlayment padding and transition strip in the common passenger walkway, which may cause passengers to trip and fall, the crewmember would have warned MCDANIEL of the dangerous conditions and MCDANIEL would have been aware of the dangerous condition. MCDANIEL therefore would never have tripped and fallen on the *CARNIVAL DREAM* on February 23, 2024.

109.     **DAMAGES**.  CARNIVAL's negligence proximately caused permanent injuries and damages to MCDANIEL in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. MCDANIEL has suffered these losses in the past and will continue to suffer them in the future.

110.     WHEREFORE, Plaintiff, MCDANIEL, demands Judgment against CARNIVAL for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the

past; and lost income and income earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under the General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## DAMAGES

111.    CARNIVAL's negligence proximately caused permanent injuries and damages to Plaintiff in the past and in the future.  Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the past; and lost income and income earning capacity in the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

## PRAYER

WHEREFORE, Plaintiff, LISA ARMENDA MCDANIEL, demands Judgment against CARNIVAL CORPORATION, d/b/a CARNIVAL CRUISE LINE for damages recoverable under the general maritime law and state law including, but not limited to, economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; lost income in the past; and lost income and income earning capacity in the future; non-economic damages in the past and in the future

including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish,

inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under

the applicable law including interest from the date of the subject incident under the General

Maritime Law, and any and all other damages which the Court deems just or appropriate.

DATED this 30th day of October, 2024.

 _/S Christopher Kubacki_____
Christopher Kubacki, Esquire
Florida Bar No. 1000986
Kubacki Law, PLLC
11437 1st Street East
Treasure Island, FL 33706
Telephone: 813-434-0176
Christopher@kubackilaw.com
Attorney for Plaintiff